### UNITED STATES v. BOUTIN.

(District Court, N. D. New York. May 11, 1918.)

1. INDICTMENT AND INFORMATION ⟨Key⟩150—DEMURRER—ADMISSION.

On demurrer to an indictment, the allegations therein should be accepted as true.

2. WAR ⟨Key⟩4—VIOLATION OF THE ESPIONAGE ACT.

An indictment charging that defendant unlawfully, willfully, and feloniously made and distributed certain pamphlets, made a part of and attached to the indictment, which were false and conveyed false statements and reports, with the intent of interfering with the operation and success of the naval forces of the United States, etc., charges an offense under Espionage Act, § 3.

3. WAR ⟨Key⟩4—ESPIONAGE ACT—OFFENSES—"MURDER."

A pamphlet denouncing preparedness, and characterizing military service as murder, or attempted murder, which offense is defined by the Penal Code as the unlawful killing of a human being with malice aforethought, *held* to tend to cause insubordination on the part of persons subject to military service, and hence the publication, etc., of such pamphlet is a violation of Espionage Act, § 3.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Murder.]

Andre Boutin was indicted for a violation of Espionage Act June 15, 1917, § 3. On demurrer to the indictment. Demurrer overruled.

This is a demurrer to an indictment found by the grand jury of the county of Onondaga, N. Y., and filed in this court April 11, 1918, and which charges the defendant with a violation of the act entitled "An act to punish acts of interference with the foreign relations, the neutrality and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes," and which act was approved June 15, 1917.

Frank J. Cregg, Asst. U. S. Atty., of Syracuse, N. Y.

George D. Chapman, of Syracuse, N. Y., for defendant.

RAY, District Judge. [1, 2] Section 3 of the so-called Espionage Act (Act June 15, 1917, c. 30), provides that:

"Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States, or to promote the success of its enemies, * * * shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years, or both."

⟨Key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The same section further provides that whoever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty in the military or naval forces of the United States, shall be punished in the same manner above cited.

The indictment demurred to in the first count thereof charges a violation of the first paragraph of section 3, above referred to, and in part quoted, while the second count of the indictment charges a violation of the second paragraph of the said section. The first count charges that the defendant unlawfully, willfully, and feloniously made and distributed to Willard W. Lewis and to others in the city of Syracuse, N. Y., false reports and false statements in and through a pamphlet called "Pure Common Sense," and from such pamphlet certain paragraphs are quoted in the indictment. It is alleged that the statements quoted were false, and that they were willfully made and conveyed, and that such false statements and reports were made and conveyed with intent to interfere with the operation and success of the military and naval forces of the United States and to promote the success of its enemies. If the statements are false, and were made with the intent charged, and were made and conveyed as charged, then the crime was complete. It is immaterial what the court may think as to whether such statements charged in the indictment were in fact false, as the court cannot act on its own information or opinion, but must act on the allegations of the indictment itself. The first count, therefore, charges an offense against the United States, and the demurrer to the first count must be overruled.

[3] As to the second count of the indictment, it charges that throughout the period of time from April 6, 1917, to the date of the finding and presentation of the indictment, April 11, 1918, the United States has been at war with the imperial German government, and that during said period of time, and on or about the 10th day of April, 1918, at the city of Syracuse, N. Y., in the Northern district of New York, the defendant, Andre Boutin, did unlawfully, willfully, and feloniously attempt to cause insubordination, disloyalty, mutiny, and refusal of duty in the military and naval service of the United States, at a time when the United States was at war, in and through and by means of articles printed and published and distributed in certain pamphlets called "Pure Common Sense," and that a copy of the said book is attached to and filed with the indictment and made a part thereof. The pamphlet, or book, "Pure Common Sense," is attached to and forms a part of the indictment, and it contains language and statements which, if read and believed, might cause, not only insubordination, but refusal of duty, in the military and naval forces of the United States.

The first part of the pamphlet states in the very beginning, "We need preparedness, not to kill one another, but to live peaceably, happily, and equally." The writer of the pamphlet then goes on to state what should be done, and what ought to be done, and what may be done, to secure happiness and prosperity, and then, branching off from the subject with which he has been dealing, the writer says: "A few words

to the reader on this cruel war." The writer then goes on to inveigh against war, and states that:

"We must teach the whole world that human beings are not here to knife one another for the sake of personal interest or to carry a point of ambition. We are here for a short visit, and should treat each other like brother and sister, whether we are born on this side or the other side of the iron post, or on the other side of a great body of water. We should all respect and help one another. War is pure ignorance. After a few years we die, and never, never return. It shows on its face that we are worse than the savage. He is the one forced to shoulder the gun, to kill and be killed, and just as long as the fancy class teaches that it is right, that it is patriotic to fight (murder) for your country, just so long will war reign."

This last is a plain statement that it is wrong to teach that it is right and patriotic to fight for your country, and that to teach men that it is patriotic to fight for your country is to teach them that it is right to murder, and that fighting for your country is to murder. The writer then goes on to say that it should be made a crime to manufacture arms of any kind, and that the laborer should be taught to stop making war machines and military supplies, and that then there would be no war; that the people should be taught that they are to blame for making the machines for all wars, and that they are the ones who do the killing. There are many other statements of this character and kind contained in the pamphlet.

It is sufficient to say that the teachings of the pamphlet tend to suppress patriotic feelings, and to cause unrest and insubordination among those who, under the Selective Draft Law, are called into the service, or made subject to military service, and that the teachings of this pamphlet, if read, also tend to incite and cause refusal of duty on the part of those subject to military duty and service under the Selective Draft Law (Act May 18, 1917, c. 15). The teachings of this pamphlet may be repudiated and rejected by a majority of the readers, but that fact makes it none the less pernicious and of a nature calculated to cause or bring about a refusal of duty on the part of those chosen for military duty and subject to military duty under the Selective Draft Act. Such sentiments, inculcated into the minds of those drafted into the service of the United States, tend to destroy military ardor and inclination to cheerfully perform military duty. It is for a jury to say whether or not the statements and teachings of the pamphlet will or will not have that effect, and whether or not the teachings of the pamphlet were intended by the writer thereof to have that effect.

This pamphlet plainly teaches, or attempts to teach, that fighting for your country, to maintain its rights, is the equivalent of murder. By section 273 of the United States Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1143 [Comp. St. 1916, § 10446]) "murder" is defined thus: "Murder is the unlawful killing of a human being with malice aforethought." This document teaches, and was intended to teach, if the writer meant what he said, that the one who is called to the colors and goes into the battle line and does his duty there is guilty of the unlawful killing, or engaged in the unlawful killing or attempt to kill, his fellows with malice aforethought. This is not only a false and a misleading statement, but one well calculated to promote the success of

the enemies of the United States, and cause or bring about a refusal to perform duty in the military and naval forces of the United States. The teaching of the pamphlet is equivalent to stating that the United States in prosecuting this war against the German Empire, is engaged in the commission of, or attempt to commit, numerous murders, and that all men in the military forces of the United States, who go on the fighting line and do their duty, are engaged in an attempt to commit murder. Does not this tend to cause insubordination and refusal of duty? And may not a jury find that the one who promulgates such a doctrine is attempting to cause refusal of duty in the military and naval forces of the United States?

The demurrer is overruled.